IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| BENJAMIN KWITEK and INTERFORM INCORPORATED, | § § § | |
| *Plaintiffs*, | § § | Civil Action No. 2:05-CV-533 |
| v. | § § | JUDGE RON CLARK |
| PILOT CORPORATION and PILOT CORPORATION OF AMERICA, | § § § | |
| *Defendants*. | § § | |

## MEMORANDUM OPINION AND ORDER CONSTRUING CLAIM TERMS OF UNITED STATES PATENT NO. 6,447,190

Plaintiff Benjamin Kwitek and Interform, Inc. (collectively "Kwitek") filed suit against

Defendants Pilot Corporation and Pilot Corporation of America (collectively "Pilot") claiming

infringement of United States Patent No. 6,447,190 ("the ` 190 patent"). The court conducted a

*Markman* hearing to assist the court in interpreting the meaning of the claim terms in dispute.

Having carefully considered the patent, the prosecution history, the parties' briefs, and the arguments

of counsel, the court now makes the following findings and construes the disputed claim terms.[1]

### I. Claim Construction Standard of Review

Claim construction is a matter of law. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370,

116 S. Ct. 1384 (1996) ("*Markman II*"). "The duty of the trial judge is to determine the meaning of

the claims at issue, and to instruct the jury accordingly." *Exxon Chem. Patents, Inc. v. Lubrizoil*

---

[1]While this Order governs in the event of any conflict between the Order and the Court's preliminary analysis at the hearing, the record may clarify the bases for the conclusions set out herein. The transcript of the claim construction  hearing will be cited as "Tr. p. ___, l. ___."

*Corp.*, 64 F.3d 1553, 1555 (Fed. Cir. 1995) (citations omitted).

"'[T]he claims of the patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (citation omitted). "Because the patentee is required to 'define precisely what his invention is,' it is 'unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms.'" *Phillips*, 415 F.3d at 1312 (quoting *White v. Dunbar*, 119 U.S. 47, 52 (1886)).

The words of a claim are generally given their ordinary and customary meaning. *Phillips* 415 F.3d at 1312. The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313. Analyzing "how a person of ordinary skill in the art understands a claim term" is the starting point of a proper claim construction. *Id.*

A "person of ordinary skill in the art is deemed to read the claim term not only in context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. Where a claim term has a particular meaning in the field of art, the court must examine those sources available to the public to show what a person skilled in the art would have understood disputed claim language to mean. *Id.* at 1414. Those sources "include 'words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Id.* (citation omitted).

"[T]he ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d

2

at 1314.  In these instances, a general purpose dictionary may be helpful.  *Id.*

However, the Court emphasized the importance of the specification.  "[T]he specification 'is always highly relevant to the claim construction analysis.  Usually it is dispositive; it is the single best guide to the meaning of a disputed term.'"  *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).   A court is authorized to review extrinsic evidence, such as dictionaries, inventor testimony, and learned treaties.  *Phillips*, 415 F.3d at 1317.  But their use should be limited to edification purposes.  *Id.* at 1319.

The intrinsic evidence, that is, the patent specification, and, if in evidence, the prosecution history, may clarify whether the patentee clearly intended a meaning different from the ordinary meaning, or clearly disavowed the ordinary meaning in favor of some special meaning.  *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979-80 (Fed. Cir. 1995).  Claim terms take on their ordinary and accustomed meanings unless the patentee demonstrated "clear intent" to deviate from the ordinary and accustomed meaning of a claim term by redefining the term in the patent specification.  *Johnson Worldwide Assoc., Inc. v. Zebco Corp.*, 175 F.3d 985, 990 (Fed. Cir. 1999).

The "'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent."  *Phillips*, 415 F.3d at 1321.  However, the  patentee may deviate from the plain and ordinary meaning by characterizing the invention in the prosecution history using words or expressions of manifest exclusion or restriction, representing a "clear disavowal" of claim scope.  *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002).  It is clear that if the patentee clearly intended to be its own lexicographer, the "inventor's lexicography governs."  *Phillips*, 415 F.3d at 1316.

3

## II. Claim Construction

The `190 patent relates to a viscoelastic grip for a writing implement.  The grip is a long tubular shell having an inner surface and an outer surface, which is adapted for attachment to a writing implement.  The outer surface of the grip includes a viscoelastic hand/finger surface, and is described as a responsive polymer designed to provide individuals with a soft and individually conforming surface.

All of the disputed terms are contained in Claim 1.  Claim 1, with the disputed terms in bold and agreed terms in italics, states:

A writing implement comprising:

a *main body having a gripping portion*;

a grip shaped and dimensioned to fit about the gripping portion of the main body so as to be *releasably secured* to the main body;

the grip including a longitudinally extending, tubular **shell having a hardness sufficient to maintain the shape of the grip**, the shell has an inner surface abutting with the main body and an outer surface, and a ***viscoelastic* hand/finger surface** positioned about the outer surface of the tubular shell; the shell further including **proximal and distal lips** *retaining the **viscoelastic* hand/finger surface** positioned in a central section of the tubular shell.

The court starts by determining the qualifications of one with ordinary skill in the art.   The parties chose to ignore this crucial aspect of claim construction in their briefs.[2]  Although the court's Order Governing Markman [Doc. # 53] informed the parties to be prepared to answer legal and technical questions, Kwitek had only the inventor present.  There was no indication that he had hired

---

[2]The technology synopses provided in accordance with the court's Scheduling Order were likewise of no help.  Kwitek's synopsis did define some basic terms and describe methods and apparatus used in measuring harness of materials. Pilot's synopsis was simply a review of prior patents, perhaps presented to prepare the way for later non-infringement and invalidity arguments.

4

or supervised those involved in grip manufacture or design.  Kwitek did not indicate that its counsel had been involved in pen manufacturing or had a degree in a relevant field of science.  Likewise Pilot chose not to have anybody at the hearing who was willing to admit to being qualified by education or experience to answer technical questions.

It became obvious that counsel for both sides were engaged in the time-honored practice of shielding their technical witnesses from answering questions in the hope, which seems to be a hallmark of patent cases, that the other side would have to provide testimony first.[3]  The problem with this approach is that the claim construction hearing is supposed to be an opportunity for each side to provide to the court the information necessary to define the disputed terms of the claims.  A party which declines that opportunity should not be allowed to later leap from behind its log swinging a sandbag labeled, "the judge didn't read the mind of our expert who was not there."  And, given the delay and expense reducing effects of early claim construction and a firm trial date, the court simply can not allow endless supplementation of briefs and Markman hearing presentations so that counsel can wait for the other side to "show yours first."  As the court informed the parties at the hearing, they are bound to the agreements and representations made at the hearing.

At the hearing, Kwitek suggested someone with a few years experience selling pens.  Tr. p. 4, ll. 15-21.  Mr. Kwitek, the inventor, said he had only a Master's in Management at the time of the invention and simply researched pen and grip manufacture on his own.  Tr. p. 7, ll. 4-25.  While he

---

[3]The court has previously remarked upon this unfortunate tendency to "hide the ball" in patent litigation, and the steps courts have taken to balance the interests of the parties, including requiring full and early disclosure of contentions and information.  *See Finisar v. DirecTV Group, Inc.*, 424 F.Supp.2d 896, 898-900 (E.D. Tex. 2006).

may be an extraordinarily gifted individual, his qualifications are not what one would deem "ordinary skill in the art."

Kwitek's own proposed claim constructions are grounded upon a familiarity with the effects of varying degrees of viscosity, elasticity, and hardness of materials.  Since Mr. Kwitek did not indicate any experience in grip manufacture, or the hiring and supervision of those who designed or made pens or grips, the court is reluctant to conclude that a salesclerk at an office supply store is "one of ordinary skill in the art."

Pilot proposed a person with a bachelor's degree in mechanical engineering and at least five or six years of experience in manufacturing of pens.  Tr. p. 6, ll. 5-13.  The statements from Pilot's counsel that he had talked to Pilot's employees and they all had many years of experience in the design and manufacture of pens only shows that one of the largest pen manufacturers in the world is able to attract and retain experienced employees.  The court is not going to adopt an unsupported definition which seems tailored only for use in discrediting the inventor or an anticipated witness.

Accordingly, the court looks to the patent, its prosecution history, and the extrinsic evidence which was presented.  Particularly helpful are the "Background of the Invention" sections of the patent at issue and earlier patents cited as references, such as U.S. Patent No. 5,000,599 ("the ` 599 patent" or "McCall.")

The patent is for a grip, made up of a shell and soft finger surface, which can be placed on a writing instrument.  Just understanding the terms in dispute requires a vocabulary including terms such as "proximal" and "distal."  Familiarity with properties of materials must include, at a minimum, a basic understanding of the concepts of viscosity, elasticity, viscoelasticity and hardness. While familiarity with a Volterra equation connecting stress and strain would allow one to describe

6

this aspect of the invention mathematically, the court cannot say that differential equations are part of the stock in trade of one of ordinary skill in the art of pen design and manufacture.  Most people have a lifetime of experience with writing implements.  Skilled artisans have made simple hand-held implements for generations without the benefit of calculus.

The court concludes that a person of ordinary skill in the art in this case would have a bachelor's degree or a technical degree in a field such as mechanical or civil engineering, manufacturing, or material sciences, with courses covering the properties of viscous and elastic materials and materials typically used in the manufacture of pens, and one to two years experience in designing or manufacturing grips for writing implements or other hand-held objects.  Sufficient experience in design or manufacture of such grips could substitute for formal education.


**1.  "Viscoelastic hand/finger surface."**  Used in Claim 1.

For this term, Kwitek proposes:

> The external aspect of the grip made of a soft material having viscous and elastic
> properties that has a hardness level between 2 and 35 on the Shore A Durometer Test
> scale.

Pilot suggests: "the external layer of the grip having viscous and elastic properties."

Both parties incorporate "viscous" and "elastic" in their definitions.  These words appear in the specification, and are used in patents listed in the "References Cited" section of this patent.  Neither of the briefs nor technology synopses defined either word.  Both of these words have specific meanings when used in a scientific context to describe the properties of materials.  While it may be

easily apparent to one skilled in the art that "viscoelastic" combines "viscous" and "elastic," which are terms understood by those skilled in the art, the substitution of two technical words for one does not explain much to a jury.

The ` 190 patent describes one embodiment "wherein the viscoelastic hand/finger surface is a viscous liquid material contained within an elastomeric bag." `190 patent, col. 2, ll. 5-6.  Another embodiment uses "silicone gel or silicone oil." ` 190 patent, col. 2, ll. 8-9.   "The viscoelastic hand/finger surface provides individuals with a soft and individually conforming gripping surface." ` 190 patent, col. 2, ll. 63-65.  After several similar descriptions, the specification states: "While preferred materials are disclosed above, other materials exhibiting similar properties may be used . . . ." ` 190 patent, col. 4, ll. 41-43.

Similar descriptions of soft materials which will fairly easily change shape in response to pressure are described in the McCall patent, which is listed in the ` 190 patent and referred to in Pilot's brief.  That patent describes a pen grip "with a soft, deformable grip. . . ." ` 599 patent, col. 2, l. 7.   A helpful description is: "the deformable putty viscous material . . . ." ` 599 patent, col. 2, l. 34.  Another is: "A deformable medium such as a relatively viscous putty . . . ." ` 599 Patent, col 4, ll. 30-31.

To one skilled in the art a  "viscous" material used in the context on a pen grip means "a soft material which will change shape under the pressure applied by fingers gripping a pen when it is used to write."[4]  This comports with the specification of the ` 190 patent, *see* col. 2, ll. 64-64, and with the definition in dictionaries.  *See* ACADEMIC PRESS DICTIONARY OF SCIENCE AND TECHNOLOGY (1992) ("viscous" means "characterized by a high degree of friction between

---

[4]The change in shape of a viscous material under pressure is sometimes called "creep."

component molecules as they slide by each other"); THE AMERICAN HERITAGE SCIENCE DIC•TION•AR•Y (2005) ("viscous" means "having relatively high resistance to flow"); THE MERRIAM-WEBSTER THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED (2002)("viscous" means "having a ropy or glutinous consistency and the quality of sticking or adhering").  At the hearing, the parties agreed to this definition. *See* Tr. p. 14, ll. 3-25.

"Elastic" is also a term describing a physical property of materials, familiar to those skilled in the art, and used in patents in this field.  The patent in dispute describes the grip as made of a material that is "a responsive, solid-phase polymer material (FIGS. 1 and 2) or a gelatinous material interposed within a more resilient material . . . ." `190 patent, col. 3, ll. 1-3.  In other words, either the grip material itself will tend to return to its original shape after being deformed, or the covering surrounding the gelatinous material will.  This comports with standard dictionary definitions. *See* McGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS (2003)("elastic" means "capable of sustaining deformation without permanent loss of size or shape"); THE MERRIAM-WEBSTER THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED (2002)("elastic" means "capable of recovering size and shape after deformation.")  At the hearing, the parties agreed that elastic means "the hand/finger surface will tend to return to its original shape after being deformed."  Tr. p. 15, ll. 4-11.

The parties agree that the "viscoelastic" surface described in the claim has both viscous and elastic properties.  In other words it will change shape under the pressure exerted by fingers holding the writing instrument and will tend to  return to its original shape when released.  This comports with the specification in the `190 patent, and in earlier referenced patents such as the McCall patent.  Standard dictionaries give similar definitions of "viscoelasticity." *See* ACADEMIC PRESS DICTIONARY OF SCIENCE AND TECHNOLOGY (1992) ("viscoelasticity" means "a condition of a liquid or solid that

9

exhibits viscosity but also memory of past deformation, with the ability to store energy elastically and to dissipate energy due to viscosity of the medium.")

The real dispute in this case is whether the claim should be interpreted to include the range of hardness levels stated in the specification but not in the claim itself.  Kwitek proposes to include in the definition the words "that has a hardness level between 2 and 35 on the Shore A Durometer Test Scale."

As the parties agreed, a Durometer is a device used to measure the hardness of materials by applying pressure with a small probe.  *See* Tr. p. 24, l. 12 - p. 25, l. 7.  The softer the material, the farther the probe reaches into the material.  The distance the probe moves is shown on a scale.  One standard of measurement used on the scales of instruments designed to measure the hardness of materials  such as plastics and rubber is called the Shore A scale.

The specification of the ` 190 patent states:

> the hand/finger surface to the present grip is an ultra-soft material.  This endows the grip with an inherent tactile feel . . .  The ultra-soft hand/finger surface can be measured in terms of hardness by the Shore A Durometer Test. The present grips have durometers in this scale between approximately 2 and 35, and more preferably 25 or less.

` 190 patent, col. 3, ll. 4-13.  The specification also states that in the preferred embodiment, the shell "preferably has a Shore A hardness of 20-25." ` 190 patent, col. 3, ll. 51-52.  This degree of hardness maintains the shape of the grip and prevents damage from chemicals and oils.  ` 190 patent, col. 3, ll. 53-55.

As frequently occurs, the parties cite opposing axioms.  Pilot asserts that the court may not import limitations from the specification to the claim.   Kwitek argues that a patentee may act as his own lexicographer, and that by referring to the Durometer and Shore A scale, the inventor did so.

Alternatively, Kwitek states that applying the specified Durometer range "gives life meaning and vitality to the claim."   The rules of construction are helpful guideposts.  But, in the end, the court must determine the meaning the term would have to a person of ordinary skill in the art, who reads the claim in the context of the specification and prosecution history, at the time of the effective filing date of the patent.  *Phillips*, 415 F. 3d at 1313.

It is clear from the specification that the viscoelastic hand/finger surface is soft – soft enough to be compressed or deformed under the pressure exerted by fingers holding a writing instrument. It is also clear that the surface will tend to return to its original shape when the writing instrument is released.

The reference to the Durometer range between 2 and 35 is found in the section titled "DESCRIPTION OF PREFERRED EMBODIMENTS."  ` 190 patent, col. 3, l.13.  It also is used only in conjunction with a description of a particular  embodiment with an  "ultra-soft" material. Elsewhere, embodiments are described as having a "soft" surface, but no Durometer reading is given. On the other hand, the preferred embodiment of the shell, described in the claim as having "hardness" at col. 8, ll. 66-67, is described in the specification as having a "Shore A hardness of 20-25."  ` 190 patent, col. 3, ll. 51-52.  This is well within the range ascribed to the "ultra-soft" hand/finger surface."  ` 190 patent, col. 3, ll. 10-13.

The patentee could have included a Shore A hardness range as part of Claim 1, or in a dependent claim.  It would not have been unusual to have seen several dependent claims stating various hardness measurements to cover various possible embodiments, if precise hardness measurements were really a limitation of the claim.

Another problem with Kwitek's argument is that a Durometer test of a material measures

how far a probe will penetrate into a material.   It is an empirical test which can be used to ensure that one batch of material is the same as, or similar to another.   A Shore A reading test may measure the "hardness" (resistance to penetration) of a material.  But "no simple relationship exists between indentation hardness determined by this test method and any fundamental property of the material tested."  ASTM D 2240 - 00, "Standard Test Method for Rubber Property – Durometer Hardness," ASTM International, pp. 1-2 *as found in* Ex. D to Kwitek's Opening Claim Construction Brief [Doc. # 56, Attachment # 4, pp. 20-21 of 50].[5]

Additionally, the patent describes embodiments in which the hand/finger surface is formed from silicone gel or silicone oil and contained within an elastomeric bag.  *See* ` 190 patent, col. 2, ll. 5-9; ` 190 patent, col. 4, ll. 36-40.  What does the Durometer measure: the hardness of the oil or the covering?  How puncture resistant is the covering and what is the measurement if the probe penetrates it?

The claim term "viscoelastic" doesn't really tell one skilled in the art much about hardness as measured on the Shore A scale by a Durometer.  And a particular Shore A reading on a Durometer does not tell one skilled in the art how viscoelastic a substance is.  Defining the disputed term as including the limitation of a Shore A hardness level would be adding something that just is not in the claim, nor defined by the patentee acting as his own lexicographer.

---

[5] This is from the standard in 2000, which was in place at the time of the patent application.

The court will construe this term as follows:

**"Viscoelastic hand/finger surface"** means " the external layer of the grip is soft

enough to change shape under the pressure exerted by fingers gripping a writing

implement to write and which will tend to return to its original shape when

released."

**2.  "Proximal and distal lips."**  Used in Claim 1.

This term is part of the claim limitation which reads:

. . . the shell further including **proximal and distal lips** retaining the viscoelastic
hand/finger surface positioned in a central section of the tubular shell.

Kwitek proposes "the edges at or near each end of the shell and which go about the

circumference of the shell."  Pilot suggests "portions of the shell outwardly extending about the

circumference of the shell at each end of the shell."

Now the party's positions about importing limitations from the specification are reversed.

Pilot wants a single reference to outwardly extending lip and a diagram to be added to the claim.

But Kwitek says no, that is merely an embodiment.

The parties agreed at the hearing  that  "proximal" and "distal" did not have to mean

right at the very end of the tubular shell.  Tr. pp. 68-69.  Pilot noted that "at or near" was not as

definite as "near" alone and might be confusing to the jury.  Tr. pp. 68-69.  Words are to be given

their ordinary meaning as understood by one skilled in the art, in the context of the patent.

However there is no indication from either party, the patent, nor the prosecution history  that

"proximal" or "distal" are specialized  words of art in the field of writing implement  grip design.

The field of art  involves grips for writing implements. The claim and specification

describes a writing implement with a "longitudinally extending, tubular shell." ` 190 patent, col.

8, l. 66; ` 190 patent, Figs. 1 & 4.  Therefore, one skilled in the art would know the claim deals

with objects in the shape of a common pen or pencil which has a longitudinal axis and two ends.

One of these ends is toward the writing tip (the "proximal" end), and the other is toward the other

end (the "distal end").  *See* ` 190 patent, col. 3, l. 41.  This comports with common dictionary

definitions.  *See* THE MERRIAM-WEBSTER THIRD NEW INTERNATIONAL DICTIONARY,

UNABRIDGED (2002)("proximal" means "next to or nearest the point of attachment or origin");

("distal" means "remote from the point of attachment or origin").  Nothing in the claim itself,

the specification, nor the prosecution history implies a further limitation of "at" or "right at" the

very end of the shell.  The court will not add such a limitation.

The next argument is whether the lip must be "outwardly extending" as urged by Pilot.

The specification does use the term "outwardly extending" in reference to the lips. ` 190 patent,

col. 1, ll. 53-55.  But, as Pilot agreed, nothing in the claim or specification, prohibits lips from

extending both inwardly and outwardly.  Tr. p. 59, ll. 11-23.  Further, nothing in the claim states

the lips must extend outwardly.

This is not to say the lips are unimportant.  The claim itself refers to lips "retaining the

viscoelastic hand/finger surface positioned in a central section of the tubular shell." ` 190 patent,

col. 9, ll 5-6.  Initially the claim did not describe lips, and it was rejected by  the PTO as

14

anticipated by the McCall patent.  *See* Office Action, 12/27/2001, p. 3, Ex. 2 to Defendants'
Responsive Claim Construction Brief [Doc. # 61, Attachment # 3, p. 5 of 6].

The patentee responded by adding the term in dispute.  *See* Kwitek's Amendment,
4/12/2002, p. 8, Ex. 4 to Defendants' Responsive Claim Construction Brief [Doc. # 61,
Attachment # 5, p. 11 of 12] .  The patentee argued to the PTO that McCall failed to disclose "a
shell including proximal and distal lips retaining the viscoelastic hand/finger surface . . . ."
Kwitek's Amendment, 4/12/2002, p. 5, Ex. 4 to Defendants' Responsive Claim Construction
Brief [Doc. # 61, Attachment # 5, p. 8 of 12].  The PTO stated "[t]he primary reason for
allowance of the claims is the inclusion in claim 1 of the shell including proximal and distal lips
that serve to retain the viscoelastic hand/finger surface positioned in a central section of the
tubular shell.  None of the art cited disclose [sic] this concept." Notice of Allowance, 4/12/2002,
p. 2, Ex. 5 to Defendants' Responsive Claim Construction Brief [Doc. # 61, Attachment # 6, p. 4
of 4].

The claim itself limits the lips to those "retaining the viscoelastic hand/finger surface
positioned in a central section of the tubular shell," so there is no need to repeat those words in
the definition of "lips."  Claims should be read broadly, and additional limitations should not be
imported from the specification, and certainly not from description of the preferred embodiment.
Additionally a claim construction hearing at which a party has no person skilled in the art to
discuss the matter is not the place to determine, as a matter of fact, that such retention is only

physically possible by lips pointing a certain direction.  Pilot's arguments, and the "lips"

limitation, may very well be dispositive of whether an accused device infringes.  But that is a

matter for another time.  The court will construe this term as follows:

> **"Proximal and distal lips"** means " portions of the shell which extend about the
>
> circumference at or near each end of the shell."

**3.  "Shell having a hardness sufficient to maintain the shape of the grip."** Used Claim 1.

Kwitek suggests "a structure or framework having an inner and outer surface and that has

a level of firmness capable of keeping or preserving the grip's shape."  Pilot proposes "a unitary

hard casing with adequate firmness to keep the grip in its originally designed shape while being

grasped with hand or finger pressure appropriate for writing."

Both proposals describe something that is firm enough to keep the shape of the grip.  This

comes straight from the claim itself.  ` 190 patent, col. 8, l. 66-col. 9, l. 1.  Obviously, in the

context of a pen grip the inventor was not talking about the shell of this soft grip being able to

maintain its shape under the crushing force of a vice.  The specification states that the shell may

be constructed from a variety of elastomers.  ` 190 patent, col. 3, ll. 48-50.   In the preferred

embodiment, the shell will have a Shore A hardness of 20-55.  ` 190 patent, col. 3, ll. 51-52.

This includes the high end of range described earlier in the specification as being "ultra-soft."

` 190 patent, col. 3, ll. 13.  These statements indicate that the shell can be fairly soft.

But it is clear that the shell has to maintain the shape of the grip when  fingers hold the

implement for writing. Of course, this does not imply that  the viscoelastic hand/finger surface

16

will be unyielding to pressure from fingers.

The real debate seems to be Pilot's attempt to add the word "unitary" to the definition.  It is true that the claim and specification always use the singular in referring to the shell as well as to the grip.  For example:

"a longitudinally extending, tubular shell . . . ."  ` 190 patent, col. 8, l. 66;

"The shell has an inner surface . . . and an outer surface. . . ."  ` 190 patent, col. 9, ll. 1-2;

"the outer surface of the tubular shell; the shell further . . . ."  ` 190 patent, col. 9, ll. 3-4;

"The shell may be constructed . . . ."  ` 190 patent, col. 3, l. 48; and

"a shell 112 shaped and dimensioned to fit about the grip . . . ."  ` 190 patent, col. 4, ll. 25-26.

But it is difficult to see what adding the word "unitary" to the definition will do.  A shell might be made of more than one piece, so long as it fulfilled the other requirements of the claim language and was not disclaimed or disavowed in the specification or prosecution history.  For example, the court can imagine a tube, split longitudinally, but constructed so as to keep its shape when squeezed.  Pilot certainly did not have anyone skilled in the art present who could explain why this would be physically impossible, or not be apparent to another skilled artisan.

There is no authority for the addition of superfluous limitations in claim construction, even if they may later be useful to the  infringement analysis of a party.  This is not to say that any grouping of disjointed pieces will be considered "a" shell or "the" shell.  Pilot will be free to argue that two or more separate pieces are not "a" shell.  But claim construction does not consist of attempting to anticipate the variety of accused devices which may be presented and then to

predict the infringement arguments that might arise from the fertile mind of learned counsel. The court will define this term as follows:

> **"Shell having a hardness sufficient to maintain the shape of the grip"** means "a structure that is firm enough to maintain the shape of the grip while the writing implement is used for writing."

### III.  Conclusion

The jury shall be instructed in accordance with the court's interpretation of the disputed claim terms in the ` 190 patent.

So **ORDERED** and **SIGNED** this **10** day of **April, 2007.**

_____
Ron Clark, United States District Judge

18